United States District Court
Southern District of Texas
**ENTERED**
June 08, 2023
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **VICTOR MODESTO HERNANDEZ MORALES,** | § § § | |
| **Petitioner,** | § § | |
| **VS.** | § § | **CIVIL ACTION NO. 4:23-CV-00281** |
| **EMILY MARIANA VARELA SARMIENTO,** | § § § | |
| **Respondent.** | § § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case arises under the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention" or "Convention"), T.I.A.S. No. 11670, as implemented by the International Child Abduction Remedies Act ("ICARA"), 102 Stat. 437, 22 U.S.C. §§ 9001-11. "[T]he Convention reflects a design to discourage child abduction." *Lozano v. Montoya Alvarez*, 572 U.S. 1, 16 (2014). Therefore, subject to certain exceptions, "courts in contracting countries must return a wrongfully-removed child to his country of habitual residence." *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 342-43 (5th Cir. 2004). The Convention's remedy of return "is based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence." *Abbott v. Abbott*, 560 U.S. 1, 20 (2010).

The present case was brought by Petitioner Victor Modesto Hernandez Morales. Petitioner seeks the return of his five-year-old son, VAHV (or "the child"), to Ecuador. In January 2022,

when he was not yet four, VAHV was brought to the United States by his mother, Respondent Emily Mariana Varela Sarmiento.

Petitioner alleges Respondent wrongfully removed VAHV from Ecuador, where the parties shared custody rights over the child. Respondent argues that Ecuador was not the child's habitual residence, and that Petitioner has not met his burden of showing that he had custody rights over the child. In the alternative, Respondent provides several defenses to return. She maintains that there is a grave risk that return would expose VAHV to physical or psychological harm or otherwise place him in an intolerable situation. She also contends that Petitioner filed the proceedings after a period of one year from VAHV's removal and the child is now settled in his new environment. Finally, Respondent claims that Petitioner should be equitably barred from bringing this case under the felony disentitlement doctrine.

For the reasons stated below, the Court **DENIES** the Petition for Return.

## I. PROCEDURAL HISTORY

This case was filed on January 25, 2023. On February 7, 2023, the Court held a hearing verifying that Respondent and VAHV were present in the district and setting a tentative timetable for the adjudication of the Petition for Return.

The Court held two evidentiary hearings in this case. On February 23, 2023, Petitioner presented three witnesses in person—Carmen Patricia Morales Casales (Petitioner's mother), Sayuri del Pilar Saavedra Asto (Petitioner's current partner), and MAHA (Petitioner's minor daughter and VAHV's half-sister). Respondent, acting pro se, had the opportunity to cross-examine the witnesses.

Respondent secured representation on April 14, 2023. The Court subsequently set an expedited timetable, and parties exchanged limited discovery. The Court held its second

evidentiary hearing on May 16 and 17, 2023. At the hearing, Petitioner served as witness for his own case, appearing over video. Respondent offered herself and Maria Mercedes Sarmiento Avendano (Respondent's mother), both testifying in person.

Respondent also provided expert testimony from Jordan Lawson, a licensed professional counselor, appearing over video. Ms. Lawson testified to the impact of domestic violence on victims and their children. Due to the expedited nature of the proceedings, Ms. Lawson did not provide a report prior to the hearing. Petitioner objected to the admission of her testimony. The Court overruled the objection, finding Ms. Lawson's testimony well-informed and not unduly prejudicial or surprising to Petitioner.

Finally, the Court heard testimony from a bilingual guardian ad litem appointed by the Court to represent the child. The guardian ad litem provided recommendations regarding the Hague Convention Article 13(b)'s inquiry into whether VAHV's return would subject him to grave risk of physical or psychological harm or an intolerable situation. She based her findings on her interviews with Petitioner, Respondent, and the child (both alone and in the presence of Respondent); her review of evidence provided by both parties; and her review of the briefings, transcripts, and the evidentiary hearings. She also testified to her understanding of the Hague Convention's substantive requirements related to her recommendation. The guardian ad litem concluded that returning the child to Ecuador would expose him to a grave risk of psychological or physical injury or place him in an intolerable situation.

The Court notes that Article 11 of the Convention directs courts to "act expeditiously in the proceedings for the return of the children." If a court has yet to decide within six weeks from the commencement date, the applicant or the Central Authority of the requesting State has the right to request a statement of reason for the delay. Courts have interpreted this directive to encompass a

non-binding goal of a full adjudication within six weeks of the start of proceedings, or as expeditiously as possible within the context of the case. *See, e.g.*, *Kufner v. Kufner*, 480 F. Supp. 2d 491, 494 n.1 (D.R.I. 2007) ("This [six week] goal, while admirable, is in large measure unreasonable in a case such as this."); *see also* Elisa Pérez–Vera, *Explanatory Report* ¶ 105, *in* 3 Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction 426 (1982) (discussing Convention's "non-obligatory time-limit of six weeks" for courts to decide).

Throughout this case, the Court has sought to balance Article 11's expediency directive with the need to provide both parties with a fair and just adjudication. Unlike Hague Convention petitioners, respondents are not provided with a network to access pro bono or reduced-fee representation. Respondent does not speak English and lacks the means to afford representation. Considering these linguistic and financial barriers—as well as the gravity of Respondent's allegation that the child would be at grave risk of exposure to harm should the Court require his return to Ecuador—the Court provided a short extension for Respondent to find counsel. Once she secured representation, the Court set a timetable that allowed limited discovery and a speedy resolution to this matter.

## II. FINDINGS OF FACT

### A. Overview

1. VAHV, the minor child, was born on April 27, 2018. (Doc. 1-4.) He is a citizen of the United States, Ecuador, Cuba, and Colombia and currently resides with his mother, Respondent, in the United States. (RX 24; Doc. 1-5.) He previously resided in Ecuador, primarily with Respondent.

2.   Petitioner is a citizen of Cuba, Colombia, and Ecuador and a resident of Ecuador. (Doc. 1-5.) He also has had residency status in Mexico, Peru, Spain, and the United States. Respondent has three minor children—MAHA, CHP, and VAHV—by three women. He currently resides with a fourth woman.

3.   Petitioner is a businessman and law student in Ecuador. (PX 7; PX 8; PX 10; Doc. 1-5.) Petitioner frequently travels out of the country for work—according to his testimony, Petitioner often travels for up to a week at a time once to twice a month. The parties dispute the legality of Petitioner's various businesses, which include a wholesale medical equipment business and an immigration consulting business. Petitioner testified that his companies are legal and registered. (PX 7; PX 10.) But, according to Respondent, Petitioner has illicitly smuggled medical equipment into Ecuador without permission and facilitates illegal human trafficking. (RX 21.) Respondent further alleges that Petitioner has referred to himself as belonging to the mafia and bragged about his ability to skirt the law.

4.   Respondent is a dentist licensed in Ecuador. She is a citizen of Venezuela and was formerly a resident of Ecuador and Spain. (Doc. 1-5.) She is currently a resident of the United States, where her asylum application is pending.

### B. Relevant Timeline

#### 1. Respondent's Prior Record of Domestic Violence

5.   Petitioner was first admitted to the United States in 2009. (RX 20.) According to his testimony, he first lived in the United States for a year and a half. He obtained lawful permanent residency through his Cuban nationality. Petitioner stated that he returned to Ecuador in 2010 but would travel to the United States frequently to obtain merchandise to sell.

6.   In 2012, Petitioner moved to Miami-Dade County, Florida with his then-wife, Monica Paz.

7.  In December 2012, Petitioner was charged with a felony of aggravated battery on his pregnant wife. (RX 10 at 2.) The couple's daughter, CHP, was born the same month. (RX 10 at 6.)

8.  In 2013, Ms. Paz filed a petition for an injunction for protection against domestic violence in a Miami-Dade County court. Ms. Paz alleged that Petitioner had threatened, assaulted, strangled, dragged, and attempted to stab her in response to her attempts to terminate their relationship. (RX 10 at 4.) The court issued an indefinite injunction and granted Ms. Paz full custody of CHP in November 2013. (RX 11.)

9.  Petitioner testified to the Court that he, not Ms. Paz, sought to make this injunction permanent "because I never wanted to see her again in my life." However, Petitioner requested a dismissal of the injunction in 2016. (RX 19.)

10. Petitioner was subsequently charged with two misdemeanors of battery and protective order violations in 2013. (RX 9.) The charges were abandoned.

11. In May 2014, Petitioner was convicted of two felonies and seven misdemeanors arising from charges of battery, harassment, domestic violence, and stalking Ms. Paz. (RX 12; RX 14.) The court sentenced him to 180 days in prison. (RX 18.)

12. Also in May 2014, Petitioner filed for divorce from Ms. Paz and sought full custody over CHP. (RX 13.)

13. On April 9, 2015, according to the guardian ad litem, Petitioner was deprived of parental rights over CHP based on the Court's finding that he is a "violent person who on several occasions physically harmed" his ex-wife and, therefore, was not "suitable" to share in parental responsibilities. (GALX 2.) When questioned, Petitioner denied being deprived of his parental rights and stated that he maintains a relationship with CHP.

14. In August 2016, the U.S. Department of Homeland Security issued removal orders against Petitioner based on his convictions for aggravated stalking and violation of an injunction for protection against domestic violence. (RX 20.)

15. Petitioner testified that he was deported to Ecuador.

### 2.  Parties' Relationship

16. Petitioner and Respondent first began a relationship in late 2016 in Ecuador. (GALX 2.)

17. In June 2017, Petitioner pushed and verbally harassed Respondent for refusing to falsify a medical excuse statement for a nonpatient.

18. In July 2017, Respondent moved out of the home she shared with Petitioner. (GALX 2.)

19. In August 2017, Respondent learned that she was pregnant.

20. In September 2017, Respondent reconciled with Petitioner, allegedly because Respondent needed bed rest and could not work. (GALX 2.)

21. According to Respondent, Petitioner was initially thrilled about the pregnancy. However, Petitioner's moods frequently changed, and he abused her throughout the pregnancy. Respondent testified that there were many episodes of abuse, including throwing fruit in her face, threatening to take her to the vet to have the child cut out of her, pushing her to the floor, and threatening to kick her.

22. In February 2018, Petitioner paid for Respondent to travel to Miami, Florida to give birth. VAHV was born in April 2018. (Doc. 1-4.) Respondent and the child lived in Florida for the next two months, staying with, at various times, Petitioner's mother, sister, and grandmother.

23. In July 2018, Respondent and the child returned to Ecuador.

24. Between August 2018 and July 2019, Respondent lived with Petitioner. Respondent worked long hours at a dental job for the Ecuadorian Minister of Public Health, commuting three

hours in each direction. Petitioner also traveled frequently for work. Respondent's mother resided with them.

25. According to Respondent and her mother, Petitioner often hit Respondent and pulled her hair during this time. VAHV was often present. At one point, Petitioner pushed Respondent while she was holding VAHV near the top of a stairwell. Both Respondent and her mother testified they thought Petitioner would push Respondent and VAHV down the stairs. Petitioner also demeaned Respondent, mocking her Venezuelan background and attempting to provoke jealousy by bragging about seeing other women.

26. Both Respondent and her mother stated that Petitioner never physically hurt VAHV. However, they testified that Petitioner displayed indifference to VAHV and would make Respondent and VAHV sleep on a mattress in a closet when VAHV cried.

27. From August 2019 to December 2019, Respondent worked in another dental office closer to home.

28. On December 29, 2019, Petitioner physically assaulted Respondent in response to an accident that VAHV had while in the shower.

29. On December 30, 2019, Petitioner, Respondent, and VAHV moved to Spain on nonworking visas. (RX 22.) Petitioner alleged he had enough funds to live in Spain without working. According to Respondent's testimony, the parties moved to Spain so that Petitioner could avoid paying child support to his daughter MAHA.

30. The parties initially traveled around Europe before settling in a hotel in Madrid.

31. On January 23, 2020, the parties terminated their romantic relationship after Petitioner verbally and physically abused Respondent for laundering his clothes with money left in his pockets. VAHV was in the room during the incident.

32. The next day, Petitioner left Spain to go to Japan, leaving VAHV and Respondent behind. He took with him the parties' luggage and money, leaving VAHV and Respondent without money or possessions.

33. The same day, he began a relationship with his current domestic partner. (GALX 2.)

34. Petitioner returned to Ecuador in February 2020. Respondent and VAHV remained in Spain with no means to support themselves. Petitioner alleges that his mother would send Respondent small sums of money each month, which Petitioner would then reimburse. Respondent and VAHV slept on the floor of a relative's home.

35. In July 2020, Petitioner returned to Spain. Respondent alleges she agreed to return to Ecuador based on Petitioner's promises that he would pay for a home, co-parent peacefully, and open a second dental clinic for Respondent to work at, with the parties splitting the profits.

36. In August 2020, Petitioner, Respondent, and VAHV returned to Ecuador.

37. Petitioner secured an apartment for Respondent and VAHV and paid for the initial month's rent. The parties maintained separate residences. VAHV lived with Respondent, but she allowed Petitioner to take VAHV when he asked.

38. Petitioner's family testified to the close relationship between Petitioner and VAHV during this time.

39. Respondent began working at the dental clinic opened by Petitioner in September 2020. According to Respondent's testimony, Petitioner closely surveilled her on clinic video cameras and would yell at her if she arrived late or got too close to a patient. Respondent purchased the clinic from Petitioner in November 2020.

40. In December 2020, Petitioner took VAHV to Colombia to secure a passport. The parties dispute whether Respondent consented to this trip or was forced to agree. (RX 29.)

41. In April 2021, Petitioner recorded himself and his current partner holding down and conducting a pinprick COVID-19 test on a hysterical VAHV. (RX 23.) Petitioner alleges Respondent gave permission for the test. Respondent alleges she did not consent and that the video shows a pattern of disregard for the child and enjoyment of the VAHV's discomfort.

42. The parties' co-parenting cooperation broke down. Petitioner alleges that disagreements arose because Respondent placed VAHV with an unauthorized babysitter and would not let him pick up the child. Respondent asserts that Petitioner had no problem with the childcare arrangement but would try to pick up VAHV outside his schedule and without her permission, disrupting VAHV's routine.

43. On August 21, 2021, Petitioner left Respondent a series of voicemails. According to the unverified recordings, he threatened to "pick you up, and I'm going to smash your head against the floor, . . . [and give you] the beating and the kicking that you deserve . . . . I'm going to bust your head open" if she did not agree to allow him to pick up VAHV from daycare the following morning. Petitioner backed his threat up with references to previous acts of violence against his former partners: "You can play with the devil, but don't play with me. You don't play around with my kids. Look, Monica tried to play with me, and I cut her arm open. I messed her all up. Do you understand? Yohana [MAHA's mother] tried to play with me, and I destroyed her house. Don't play with my son. Whenever I'm here and I want to go see my son, I will go see him." Petitioner also bragged about his ability to hurt Respondent anywhere: "you're going to have to get the hell out of here and out of this fucking country, and don't forget that I've got three or four different passports." (RX 25, 26, 27, 28.) Petitioner admitted that the recordings captured his voice but testified that he never followed through on the threats.

44. On August 22, 2021, Respondent left with VAHV for her brother's home in Guayaquil, Ecuador. Respondent testified that she fled in the middle of the night because she was scared after receiving the voicemails. She filed a criminal complaint against Petitioner, alleging she had received repeated death threats and endured physical and psychological abuse from Petitioner. (RX 29; RX 30.)

45. On September 2, 2021, an Ecuadorian court granted a temporary restraining order against Petitioner. (RX 31.)

46. On September 3, 2021, Petitioner filed a custody petition. (GALX 2.)

47. On September 28, 2021, an Ecuadorian court granted a temporary visitation order to Petitioner, allowing him visitation with police supervision.

48. On November 14, 2021, an automobile incident occurred at a stoplight several blocks from Respondent's home and a longer distance from Petitioner's home. Parties disagree as to the facts. Petitioner testified that Respondent, her father, her sister, and her sister's partner (with VAHV in their car) all attacked Petitioner—kicking the doors to his car, punching the window, scratching him, and attacking him with pepper spray and a taser. Petitioner stated he defended himself with his belt. Respondent testified that Petitioner attempted to force the family car off the road and blocked the car's path while laughing. When the family got out to address the situation, Petitioner started hitting Respondent's sister with his belt. Respondent called the police, but they did not arrive until an hour later. Both Respondent's sister and Petitioner filed police and medical reports documenting their injuries. (RX 34.) VAHV has recounted the incident to therapists and the guardian ad litem, largely confirming his mother's account. (RX 45.) Based on these sworn accounts, the proximity of the parties to Respondent's home, and photos of the incident, the guardian ad litem concluded that Respondent's testimony carried more credibility.

49. On January 25, 2022, an Ecuadorian court expanded Petitioner's visitation rights and eliminated any supervision requirement. (PX 9.) The same day, allegedly based on the advice of her Ecuadorian attorney, Respondent and VAHV left the country.

### 3.  Post-Removal Events

50. Respondent and VAHV first resided in New Jersey upon their arrival in the United States. Respondent obtained a temporary restraining order against Petitioner. Respondent sought asylum and passed her credible fear interview.

51. On April 11, 2022, an Ecuadorian court found that Respondent and VAHV were outside Ecuador. On April 19, 2022, Petitioner filed a request for return. On December 1, 2022, the U.S. Department of State sent Petitioner's application to Respondent. On January 25, 2023, a Petition to Return was filed in this Court.

52. In Houston, VAHV has undergone several psychological evaluations and is currently in regular therapy. VAHV's teacher referred him to a school counselor in January 2023, reporting that VAHV lost his temper frequently and threatened students in class. (RX 45.) A January 2023 evaluation found the child exhibited hyperactivity, anxiety, restlessness, destruction of property, and defiant behavior. (RX 38 at 1.) The report concluded that the child has symptoms of post-traumatic stress disorder (PTSD), based on these symptoms and on Respondent's representations. *Id.* at 5. A second consultant confirmed these findings. (RX 43.) Ms. Lawson testified that these symptoms are consistent with a PTSD diagnosis. She also testified that a patient can receive a diagnosis of PTSD only if he has been exposed to a threat.

### C.  Findings on Domestic Violence

53. Based on Ms. Lawson's testimony, the Court finds the following about the manifestations of domestic violence and its impact on victims and family members.

54. Experts categorize domestic abuse into four categories—emotional abuse (including isolation and financial control), verbal abuse (including threats, criticism, and put-downs), physical abuse (including physical attacks and physical intimidation), and sexual abuse.

55. Domestic violence is rooted in attempts to impose coercive control on a victim. The violence can manifest in cycles, where an abuser exhibits periods of "manipulative kindness," intimidation and threats, and intensifying abuse.

56. Abuse often escalates when victims attempt to exhibit control, particularly when trying to leave the abusive relationship.

57. Victims often continue or return to living with their abuser to protect themselves and their children.

58. Adult-on-adult domestic violence can cause trauma on children even if the children do not directly experience or witness the abuse themselves. According to the Adverse Childhood Experiences study cited by Ms. Lawson, witnessing or living with domestic violence can reduce a child's IQ, inhibit physical growth, and lower their immune system.

59. Children exposed to domestic violence can develop PTSD. Symptoms of PTSD can include hyperactivity, anxiety, depression, aggression, and low impulse control.

60. Without intervention, domestic violence often escalates and is directed at new victims.

61. Domestic or intimate partner violence is a significant indicator of child abuse. Children raised in homes with domestic violence are 1500 times more likely to be victims of child abuse themselves.

62. Children rely on safe caregivers for healthy development and recovery. A secure attachment with at least one adult creates consistency and predictability, allowing children to grow and heal.

63. Disrupting that relationship can result in "attachment trauma," which severely impacts a child's psychological well-being. This impact is especially strong for younger children.

### D.  Factual Conclusions

64. In sum, the Court finds that Petitioner has a history of repeated violence against the mothers of all three of his children. He is a convicted felon with a criminal record of domestic violence and injunction violations.

65. Petitioner's abuse has been systematic and spanned time and relationships. The November 2021 car incident suggests Petitioner's violence has extended to individuals beyond intimate partners.

66. Petitioner exposed Respondent to physical, emotional, and verbal abuse over an extended period. His abuse included physical attacks, threats of violence, emotional manipulation, intrusive surveillance, and financial coercion.

67. Neither party alleges that Petitioner has physically hurt his children in the past. Petitioner's witnesses testified to his love for his children.

68. However, the evidence suggests that Petitioner's concern is inconsistent. Petitioner has displayed indifference to his children, a willingness to inflict abuse in his children's presence, and a willingness to abandon his children. Respondent also provided evidence indicating an inclination to use custody or child support to control or punish his prior partners—Petitioner sought full custody over CHP during divorce proceedings, sought to relocate to avoid paying child support to MAHA, and sought visitation with VAHV after Respondent filed a restraining order.

69. Petitioner produced no evidence that he has reformed or taken steps to avoid repeating his past acts. In his testimony to the Court, Petitioner expressed no acceptance, remorse, or reflection over any acts of violence or criminal convictions.

70. VAHV has exhibited symptoms consistent with PTSD and is currently receiving therapy.

## III. FINDINGS OF LAW

### A.  Legal Standard

A Hague Convention case is not a custody proceeding—the Convention mandates that courts should determine only the jurisdictional merits of the case for return of the child and should not evaluate the underlying merits of the custody case. *See England v. England*, 234 F.3d 268, 271 (5th Cir. 2000).

A Hague Convention case consists of two parts.

The first is the prima facie case. Petitioner must establish by a preponderance of the evidence that a child under the age of sixteen has been wrongfully removed or retained from their habitual residence in violation of the custody rights of the left-behind parent. 22 U.S.C. § 9003(e)(1)(A). Under the Hague Convention:

The removal or the retention of a child is to be considered wrongful where—

a)  it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention; and
b)  at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Convention Art. 3.

If a prima facie case is made, a respondent may provide several affirmative defenses:

- The proceedings were commenced after a "period of one year," and the child is "now settled in its new environment." Convention Art. 12.

- Petitioner consented or acquiesced to the removal. Convention Art. 13.

- A mature child objects to return. Convention Art. 13(a).

- "[T]here is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Convention Art. 13(b).

- Returning the child would result in a violation of "human rights and fundamental freedoms." Convention Art. 20.

The first three defenses can be established by a preponderance of evidence; the latter two require clear and convincing evidence. 22 U.S.C. § 9003(e)(2).

### B. Analysis

#### 1. Petitioner's Prima Facie Case

The Court first considers whether Petitioner has established by a preponderance of the evidence that VAHV was wrongfully removed from Ecuador. Respondent challenges two elements of the prima facie case—whether VAHV was a habitual resident of Ecuador at the time of his removal, and, if so, whether Petitioner had custody rights over VAHV. Respondent does not dispute that VAHV is under sixteen or that, if Petitioner had custody rights over VAHV, he was attempting to exercise them at the time of the removal.

#### i. VAHV's Habitual Residence

The Hague Convention does not define "habitual residence." The Supreme Court has clarified that a trial court should conduct a "fact-driven" and case-specific examination into where the child is "at home, at the time of removal." *Monasky v. Taglieri*, 140 S. Ct. 719, 726-27(2020). This inquiry can include the perspectives of both the parents and the child. "Because children, especially those too young or otherwise unable to acclimate, depend on their parents as caregivers, the intentions and circumstances of caregiving parents are relevant considerations. No single fact, however, is dispositive across all cases." *Id.* at 727.

Petitioner argues that Ecuador was VAHV's habitual residence. The child lived in Ecuador from August 2018, when he was three months old, to December 2019, and again from August 2020 to his removal from the country in January 2022. The parents agreed to move the child from Spain to Ecuador in 2020.

Respondent argues that Spain, or no country at all, should be the child's habitual residence because the August 2021 move from Spain to Ecuador was either coerced or conditioned on Petitioner's subsequently broken promises. Domestic violence and coercion can undermine shared intent to settle in a country. *See id.* ("[S]uppose, for instance, that an infant lived in a country only because a caregiving parent has been coerced into remaining there. Those circumstances should figure in the calculus."); *Silverman v. Silverman*, 338 F.3d 886, 900 (8th Cir. 2003) ("Habitual residence is not established when the removing spouse is coerced involuntarily to move to or remain in another country."); *Tsarbopoulos v. Tsarbopoulos*, 176 F. Supp. 2d 1045, 1056 (E.D. Wash. 2001) ("The verbal and physical abuse of one spouse by the other is one of several factors in the Court's determination of the existence of 'shared intent' to make a place the family's 'habitual residence.'"). Further, the decision to settle and create a habitual residence in a country can be conditional and, therefore, revoked if breached. *See, e.g.*, *Ruiz v. Tenorio*, 392 F.3d 1247, 1257 (11th Cir. 2004) (finding mother's agreement to move was "clearly conditional upon improvements in their marriage, was expressed and in the open, and was well-known").

However, under *Monasky*'s totality of the circumstances analysis, a lack of agreement between parents may not be dispositive. Rather, "a wide range of facts other than an actual agreement, including facts indicating that the parents have made their home in a particular place, can enable a trier to determine whether [child's] residence in that place has the quality of being 'habitual.'" *Monasky*, 140 S.Ct. at 729.

The record suggests that both parents saw Ecuador, not Spain, as their home at the time of VAHV's removal. Even if there was some intent at some time to settle in Spain, the evidence presented to this Court suggests that there was little understanding of Spain as a home during the eight months VAHV lived there. The family traveled around Europe and stayed with friends and family or in hotels. After Petitioner left, Respondent and the child stayed on the floors of a relative's home. Respondent had no legal way to make a living or to work. In contrast, once back in Ecuador, both parties had long-term homes and employment. The record also suggests that both parties had significant family ties in Ecuador. In sum, unlike other cases of coerced or conditioned residences considered in Hague Convention contexts, the preponderance of both parties' ties lay in Ecuador.

In addition, VAHV likely saw Ecuador as his home. Unlike the infant at issue in *Monasky*, VAHV was a toddler at the time of his removal from Ecuador. VAHV lived in Ecuador for a year and a half after his return from Spain. He went to daycare in Ecuador and spent time with family members. He retains memories from his time in Ecuador.

The Court finds that Petitioner meets his burden of establishing by a preponderance of the evidence that Ecuador was the child's habitual residence at the time of removal.

## ii.    Petitioner's Custody Rights

Having determined that Ecuador was the place of habitual residence, the Court determines whether Petitioner had custody rights under Ecuadorian law. Courts "must apply the laws of the country of the child's habitual residence to determine if the non-removing parent had 'rights of custody' within the meaning of the Convention." *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 343 (5th Cir. 2004). Custody rights can be established by operation of law, judicial or administrative decision, or agreement between parties. Convention Art. 3. "In determining foreign

law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." Fed. R. Civ. P. 44.1. "[I]n determining this law the court is not limited by material presented by the parties; it may engage in its own research and consider any relevant material thus found." Fed. R. Civ. P. 44.1 Advisory Committee's Note.

Under the Convention, rights of custody "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Convention Art. 5. In *Abbott v. Abbott*, 560 U.S. 1 (2010), the Supreme Court interpreted this provision to go beyond physical custody. *Abbott* concerned the alleged wrongful removal of a child from Chile. Following the parents' separation, a Chilean court granted the mother the daily care and control of the child, and the father "direct and regular" visitation. *Id.* at 6. A Chilean statute conferred *ne exeat* rights, providing that "'[o]nce the court has decreed' that one of the parents has visitation rights, that parent's 'authorization . . . shall also be required' before the child may be taken out of the country." *Id.* at 10. The mother took the child to the United States without the father's permission. The Supreme Court held that the statutory *ne exeat* clause gave the father joint custody rights. The court acknowledged that a *ne exeat* clause may not fit "traditional notions of physical custody," but reasoned that the Convention established at uniform concept of custody rights. *Id.* at 12.

Petitioner alleges that he has parental authority over the direction and maintenance of the care of VAHV pursuant to the existing visitation order and the Ecuadorian Code of Childhood and Adolescence ("ECCA"), which prohibits the improper retention of a child or hindrance of a

visitation regime. ECCA Art. 125.[1] He also argues that the ECCA requires minor children traveling internationally with one parent to have the other parent's consent. ECCA Art 109.[2]

Respondent argues Petitioner has not carried his burden of proving Ecuadorian law. Respondent also cites a provision of the ECCA setting a presumption of custody to the mother. ECCA Art. 106.[3] However, this article seems to be about physical and not legal custody.

Citing Article 118 of the ECCA, another district court in this circuit has found that "Ecuadorian law provides that a parent who is not awarded physical custody of the child still maintains his or her custody rights." *Vera Revelo v. Canizalez Cedeno*, No. 6:22-CV-01419, 2022 WL 4009699, at *5 (W.D. La. Sept. 2, 2022) (analyzing ECCA although parties did not dispute this element).

---

[1] Article 125 reads, in part:

> Improper retention of a child.- The father, the mother or any person who improperly retains a child whose custody, possession or guardianship has been entrusted to another, or who hinders the schedule of visitation, may be subject judicially to being enjoined from the same and ordered to immediately surrender the child.

[2] Article 109 reads, in part:

> Authorization to leave the country.- Ecuadorian children and teenagers as well as aliens residing in Ecuador who travel abroad with one of their parents must have the authorization of the other parent. If they are traveling by themselves or with third parties, the authorization of both their parents is required, except if one of the parents has been deprived of custody; or in the absence thereof, with authorization from the Court.

[3] Article 106 reads, in part:

> Rule to decide to whom shall custody of the children be entrusted.- . . .
> 2.- In the parents are unable to reach an agreement or if whatever they agreed is not in the best interest of their children, custody of those under twelve years of age shall be entrusted to the mother, except if it is proven that to do so will harm the rights of the children; . . .
> 4.- If both parents demonstrate equal capabilities, the mother shall be preferred, provided that doing so does not affect the best interest of the children."

Given the existence of a standing visitation order, the *ne exeat* rights in the ECCA, and parallel case law, the Court finds that Petitioner shared legal custody rights over VAHV under Ecuadorian law at the time of the child's removal.

In sum, the Court finds that Petitioner has met his burden of proving, by a preponderance of the evidence, that VAHV was wrongfully removed from Ecuador.

### B. Respondent's Affirmative Defenses

Having found a prima facie case of wrongful removal exists, the Court next turns to Respondent's affirmative defenses against return.

### 1. Article 13(b)

Under Article 13(b) of the Convention, a court may refuse to return a child if it finds that "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Article 13(b) is a "narrow" exception, and courts must avoid adjudicating the underlying custody dispute. *England v. England*, 234 F.3d 268, 271 (5th Cir. 2000). Respondent must prove the defense by clear and convincing evidence. 22 U.S.C. § 9003(e)(2)(A).

Respondent first argues there is a grave risk that returning VAHV to Ecuador would expose him to physical or psychological harm.[4]

---

[4] While courts often conduct a single Article 13(b) analysis, "physical and psychological harm" and "intolerable situation" are separate inquiries.

> The ordinary meaning of "expose the child to physical or psychological harm or otherwise place the child in an intolerable situation" suggests that an "intolerable situation" must be different from "physical or psychological harm," but nevertheless serious. . . . "[O]therwise" means "in a different way or manner," "in different circumstances," or "in other respects." Webster's Third New International Dictionary 1598 (2002). Therefore, an "intolerable situation" must be different in way or manner from physical or psychological harm.

An examination of a grave risk defense will often look at the nature, frequency, and intensity of past events. Evidence of past abuse indicates a child's risk of exposure to future violence and the abuser's propensity for future harm. But the ultimate determination must be forward-looking—past actions are not per se determinative. *Baran v. Beaty*, 526 F.3d 1340, 1346 (11th Cir. 2008) ("To deny return, the district court was not required to find [the child] had previously been physically or psychologically harmed; it was required to find returning him [] would expose him to a present grave risk.").

Courts have found that evidence of prior intimate partner violence may demonstrate a risk for future child abuse. The Fifth Circuit has rejected "a bright-line rule that allegations of spousal abuse create grave risk to a child." *Soto v. Contreras*, 880 F.3d 706, 713 (5th Cir. 2018). However, it has affirmed that "sustained spousal abuse can, in some instances, create [a grave] risk." *Id. See Gil-Leyva v. Leslie*, 780 F. App'x 580, 590 (10th Cir. 2019) (finding respondent "must 'draw a connection' showing that the risk such abuse poses to her 'constitute[s] a grave risk to the children'"); *see also Gomez v. Fuenmayor*, 812 F.3d 1005, 1010 (11th Cir. 2016) ("While the proper inquiry focuses on the risk faced by the child, not the parent, we hold that sufficiently serious threats and violence directed against a parent can nonetheless pose a grave risk of harm to a child as well."); *Ermini v. Vittori*, 758 F.3d 153, 164 (2d Cir. 2014) ("Domestic violence can satisfy the defense when the respondent shows by clear and convincing evidence a 'sustained pattern of physical abuse and/or a propensity for violent abuse.'"); *Van de Sande v. Van de Sande*, 431 F.3d 567, 570 (7th Cir. 2005) (holding respondent's evidence of her husband's propensity for violence was sufficient to deny return: "the probability that [the father] . . . would someday lose

---

*Pliego v. Hayes*, 843 F.3d 226, 233 (6th Cir. 2016) (internal citations omitted). Accordingly, this Court considers the clauses separately, recognizing that the "intolerable situation" exception is significantly underdeveloped in American case law. *Id.*

control and inflict actual physical injury on the children . . . could not be thought negligible");
*Walsh v. Walsh*, 221 F.3d 204, 220 (1st Cir. 2000) (a "clear and long history of spousal [or other
intimate partner] abuse" may establish grave risk, noting that "both state and federal law have
recognized that children are at increased risk of physical and psychological injury themselves when
they are in contact with a spousal abuser").

Legislative and scientific findings on rates of co-occurrence buttress these conclusions. In
*Walsh*, the seminal case about the issue of domestic violence as it relates to the grave risk standard,
the First Circuit cited a congressional resolution recognizing that "the effects of physical abuse of
a spouse on children include . . . the potential for future harm where contact with the batterer
continues" and that "children often become targets of physical abuse themselves or are injured
when they attempt to intervene on behalf of a parent." 221 F.3d at 220 (quoting H.R. Con. Res.
172, 101st Cong., 104 Stat. 5182, 5182 (1990)). The opinion also cited "credible social science
literature establish[ing] that serial spousal abusers are also likely to be child abusers." *Id.* Ms.
Lawson, Respondent's expert, echoed these findings, citing a study finding that children raised in
homes with domestic violence are 1500 times more likely to be victims of child abuse themselves.

Further, several courts have found that a high likelihood of exposure to violence directed
at others is sufficient to create a risk of psychological harm in the child. *Khan v. Fatima*, 680 F.3d
781, 787 (7th Cir. 2012) ("[R]epeated physical and psychological abuse of a child's mother by the
child's father, in the presence of the child (especially a very young child, as in this case), is likely
to create a risk of psychological harm to the child."); *see also Souratgar v. Lee*, 720 F.3d 96, 104
(2d Cir. 2013) (stating "a showing of the child's exposure to [] abuse" could support the grave risk
of harm defense but may not be dispositive); *Elyashiv v. Elyashiv*, 353 F. Supp. 2d 394, 408-09

(E.D.N.Y. 2005) (finding that a "child's observation of spousal abuse is relevant to the grave risk inquiry").

According to Ms. Lawson, children exposed to repeated domestic violence will often experience psychological and physical harm, including PTSD, hyperactivity, lowered IQ, stunted growth, and weakened immune systems—reflecting the mental and physical toll violent environments can have on children. Several courts have found that a risk of PTSD constitutes grave risk under Article 13(b). *See, e.g., Danaipour v. McLarey*, 286 F.3d 1, 17 (1st Cir. 2002) (holding that evidence regarding PTSD can have "a direct bearing on grave risk determinations"); *Blondin v. Dubois*, 238 F.3d 153, 158 (2d Cir. 2001) (affirming district court's grave risk determination based on a finding the children would suffer from a recurrence of PTSD); *Elyashiv*, 353 F. Supp. 2d at 408 (denying repatriation based on a history of domestic abuse, threats of violence, and expert testimony that the children would suffer relapse of their PTSD symptoms); *Reyes Olguin v. Cruz Santana*, No. 03 CV 6299 JG, 2005 WL 67094, at *6-8 (E.D.N.Y. Jan. 13, 2005) (denying petition on record of frequent violence in front of the children and expert testimony that a return to Mexico would exacerbate the PTSD suffered by the older child).

Respondent urges the Court to find that she has met her burden to prove, by clear and convincing evidence, that VAHV faces a grave risk of physical or psychological harm should he be returned to Ecuador. Respondent proposes that VAHV would be at grave risk of experiencing three types of injury: future abuse from Petitioner, exposure to Petitioner's violence targeted at others, and exacerbated psychological harm due to his potential separation from his mother.

The guardian ad litem came to the same conclusion, finding Petitioner has engaged in pervasive abuse, lawlessness, and gaslighting that would place the child at significant risk if returned to Ecuador.

Petitioner depicts himself as a caring father, desperate to be reunited with his young son. In response to Respondent's positions, Petitioner argues that evidence of prior attacks does not necessarily mean a future risk exists. He further contends that Respondent will not return to Ecuador; therefore, there will be no future opportunity for VAHV to witness violence against his mother. Finally, Petitioner argues that, because he has never abused any of his children, the high threshold of grave risk of exposure to future harm required by the Convention is not met.

Based on the totality of the facts presented, this Court finds that Respondent has met her burden to establish grave risk by clear and convincing evidence. First, Respondent has submitted significant evidence—in the form of credible witness testimony, voicemails, emails, police reports, and court documents—that Petitioner has a propensity for and sustained pattern of violence over an extended period. This violence has been primarily directed at current and former intimate partners. However, the sum of Respondent's evidence indicates that Petitioner's violence has extended beyond these partners, including to other members of Respondent's family.

Petitioner is a convicted felon in the United States who assaulted his pregnant wife and continually and violently violated the standing restraining order against him. This ultimately resulted in his deportation from the United States and a court finding that he was an unfit father to his daughter. *See, e.g.*, *Walsh v. Walsh*, 221 F.3d 204, 222 (1st Cir. 2000) (applying grave risk exception based on "father's flight after indictment for threatening to kill another person in a separate case and a documented history of violence and disregard for court orders"). When questioned, Petitioner repeatedly misrepresented facts and expressed neither remorse nor reflection about his actions.

Upon Petitioner's return to Ecuador, the evidence indicates that Petitioner began a new cycle of abuse against Respondent. Respondent's account reflects numerous rounds of courtships

and promises, growing abuse, and attempts to escape or end the relationship. Introducing a child into their relationship heightened Petitioner's attempts to control Respondent. Respondent has presented consistent and largely unrefuted testimony as to numerous specific attacks over the six years of their relationship, as well as voicemail recordings containing graphic threats of violence and demeaning language. Many of these incidents occurred in the presence of VAHV. And, while no party has alleged that Petitioner physically abused VAHV, Respondent and the guardian ad litem have alleged a pattern of disinterest and neglect.

The evidence also suggests that this violence has already impacted VAHV. Counseling records from VAHV's school and therapist demonstrate VAHV is suffering from hyperactivity, anxiety, and depression—symptoms consistent with a diagnosis of PTSD. VAHV attends regular therapy and is doing much better, but some of these symptoms remain. The child can recount to both therapists and the guardian ad litem his memory of the November 2021 car incident, as well as a memory of his father hitting his mother. According to Ms. Lawson's testimony, a child in VAHV's situation would likely experience a relapse of PTSD symptoms if he were returned.

The Court finds none of Petitioner's responses compelling. Petitioner is an unreformed and repeated abuser. His own words suggest that he is proud of this fact. If Respondent returns with VAHV to Ecuador, the evidence indicates that Petitioner will likely resume his abuse of Respondent and, thus, that VAHV would be subject to renewed exposure to the pattern of violence. Even if Respondent will not or cannot (by virtue of her immigration status) return to Ecuador, Respondent has adequately demonstrated that VAHV is at significant risk of being exposed to his father's abuse of domestic partners and others who may seek to challenge his control. Based on Petitioner's prolonged history of violence, a serious risk exists that this abuse would also be directed at VAHV. While Petitioner has promised to put VAHV in counseling and school in

Ecuador, Ms. Lawson emphasized that these steps would do little to ameliorate continuing exposure to violence or the permanent psychological damage imposed on VAHV by forcing his separation from his mother.

Petitioner has not explicitly addressed whether adequate measures of protection would be available in Ecuador. Nevertheless, the Court finds that obvious ameliorative measures would likely be inadequate.[5] The evidence suggests that Petitioner's multiple citizenships and financial resources have allowed him to circumvent the law, and that Ecuadorian police and justice system have failed to provide adequate protections in the past.

None of these considerations amounts to an adjudication of custody. The Court does not consider whether the Ecuadorian court's visitation determinations were proper. Nor does it consider where the child will have access to the best schools, healthcare, or other resources. Its inquiry remains entirely focused on the clear and convincing evidence that VAVH faces grave risk of exposure to physical and psychological harm—whether through abuse himself or exposure to harm imposed on others—at the hands of Petitioner.

### 2. Alternative Defenses

Respondent proposes two additional statutory defenses: that there is a grave risk that return would place the child in an intolerable situation (Convention Art. 13(b)), and that Petitioner filed the proceedings after a period of one year from VAHV's removal and the child is now settled in his new environment (Convention Art. 12). In addition, she argues that Petitioner is not entitled to

---

[5] "While a district court has no obligation under the Convention to consider ameliorative measures that have not been raised by the parties, it ordinarily should address ameliorative measures raised by the parties or obviously suggested by the circumstances of the case." *Golan v. Saada*, 142 S. Ct. 1880, 1893 (2022).

seek affirmative relief from this Court under the fugitive disentitlement doctrine. Having found a grave risk of harm, the Court declines to reach the merits of these alternative defenses.

## IV. CONCLUSION

Based on the sum of the evidence presented and its assessment of the credibility of the witnesses, the Court finds that Respondent has met her burden of proving, by clear and convincing evidence, that VAHV is at grave risk of being exposed to physical and psychological harm should the Court order his return to Ecuador. The Court declines to order return. The Petition for Return is therefore **DENIED**.

**IT IS SO ORDERED**.

Signed at Houston, Texas on June 8, 2023.

Keith P. Ellison
United States District Judge